Good afternoon, Illinois Appellate Court. First District Court is now in session. First Division, the Honorable John Griffin presiding. Case number 1-9-0790, Jeffrey Hubert versus Board of Education of City of Chicago. Welcome, everybody, and we look forward to this. Each side gets 20 minutes. Does the appellant want to reserve any time? Yes, Your Honor, if I could have five minutes for a moment. Okay, and it's a little bit awkward. We're working our way through this, but the, well, probably, maybe I'm going to suggest we raise our hand if we need to get something when somebody is already speaking. So we'll try that. Anyway, I think that covers it. Can we get the names of the other lawyers, please? Oh, yeah, sure. Yeah, do you all want to introduce yourselves, please? Good afternoon, Your Honor. My name is Sabrina Ellamine, representing Defendant Appellant, Chicago Board of Education, and Nadine Abraham is also on the line from my firm, but I'll be doing the argument today. Great. Good afternoon, Patrick Giese for Mr. Hubert, the appellant in this case. Okay, welcome. Thank you. All right, you want to start? Thank you, Your Honor. Good afternoon. May it please the court and counsel. We are here today because this was not a case for summary judgment because the record stated that there were tribal issues of fact on the defendant's true motivation for Mr. Hubert's termination. Reasonable inferences in this record demonstrated that Mr. Hubert was fired for reporting illegal activity to law enforcement because working with law enforcement to curb abuses within his department diminished Paul Oslund, his supervisor's chances of securing private sector employment. And with the deepest respect to the trial court, we believe it accepted weight arguments supporting the board's interpretation of the facts, which was more properly the role of the jury. Let me, yes, I like that question. Let's go to the issue of Mr. Oslund. There is a difference in the briefs with regard to what he knew with regard to Mr. Hubert going to legal law enforcement. And the appellee says he denied it, didn't know about it, period. You say you knew about it. Which is, I mean, why should we, where in the record does it say that Hubert knew about it? So, Your Honor, thank you for the opportunity to answer that question. I would point the court to, um, undisputed evidence in the record that Mr. Hubert worked alongside the office of the Inspector General in the investigation to uncover fraud involving one of the previous CPS bus vendors, Jewel's Bus Company. So that's, uh, that demonstrates a willingness on Mr. Hubert's behalf that he is willing to work with law enforcement type officials to root out fraud within his department. We also have Mr. Hubert's testimony in this case that he did in fact work with the FBI and wore a wire for a short time. Um, and we also have what we believe is one of the most critical pieces of evidence to demonstrate Mr. Oslund's where, uh, he referred to the fate of a whistleblower involved in an investigation of Jewel's, of a known affiliate of Jewel's Bus Company in the mid 1980s. Now, defendants suggested to the trial court that this email held no significance because it involved a different entity under the city of Chicago banner, um, and a different whistleblower. And we would respectfully submit that this is a misconstruction of how this evidence could and should be used at a trial in this matter, because the significance of the email is not the literal meaning of the words contained in that email. It is the message that was communicated to Mr. Hubert, which he testified to that he viewed that as a threat that Mr. Oslund was aware he had been working with law enforcement and that if he continued to work with law enforcement, he would be terminated. So you're saying that in response to the appellee's, uh, argument or statement that he, Mr. Oslund never knew about this, you're saying there's circumstantial evidence, particularly the email itself that indicates that knowledge. Otherwise, why would he send an email like that that particular time? That's exactly right. Justice. Uh, that's exactly right. Um, and when we combine that evidence with Mr. Hubert's vocal and consistent distaste for, uh, the vendors who he believed were perpetrating a fraud on Chicago taxpayers and Medicaid program, um, this email does when viewed in the light, most favorable, uh, to Mr. Hubert on summary judgment does support a strong inference of Mr. Oslund's knowledge and what's going to happen to Mr. Hubert. If he continues to work with one, which is you will be terminated. And we respectfully submit that these dueling narratives that had come out in the briefing, um, entitled entitled, uh, Mr. Hubert to jury reconciliation on these points after a jury has had an opportunity to observe the demeanor and credibility of these witnesses. Um, but instead, uh, with respect to the trial court, the defendant's version of events, um, namely that Mr. Oslund testified, he had no knowledge, um, was simply accepted, which was, we believe improper at that stage in proceedings, given the evidence that the plaintiff set forth in opposition to summary judgment. Now, the evaluation of this particular piece of evidence taken in combination with the remainder of the record is also critical because it sheds doubt on the board's stated reason for Mr. Hubert's termination that, uh, he was insubordinate, which was a motive that the court accepted the trial court accepted. Um, in spite of the fact that there was significant evidence presented, uh, that this reason was in fact pretext. And if I could walk through briefly, the inferences that this record generated, um, we can, we can conclude a reasonable jury could conclude that, uh, this was a dysfunctional work environment. Headed by an inexperienced leader struggled to manage the personnel in his department and where squabbles angry exchanges and profanity were more or less normal. And a jury could reasonably conclude in light of that evidence that the board's stated reason for termination was in fact behavior distant with the dysfunctional culture that was fostered by Mr.  And let's go on a little, uh, an issue related to that. Uh, now you contended that the, uh, investigation by the CVS was procedurally improper. Yes, sir. What's the basis for that? Well, they failed to follow their own procedures. The significance of it being procedurally improper, uh, is not in our view intended to be evidence that they failed to follow their procedures. And thus, uh, we've created an issue of fact on the motive it, uh, on the motive element. The issue is that it tends to support our theory that Mr. Hubert, that they built, they manufactured a reason to terminate Mr. Hubert. And this is, this is, we think a critically important and very reasonable inference that a jury could conclude when you look at, uh, the, the, the entire record. If I could, I could point to the defendant's position on this, that they have cited to numerous instances, including in March of 2013, August of 2014, September of 2014, October of 2014, where Mr. Hubert was purported to have lost his temper with coworkers. And there was one instance where Mr. Hubert was purported to have caused one of his coworkers to be reduced to tears. And all of this conduct up to that point, there had been no referral to HR. There had been no attempts at mediation with HR professionals. There had been no investigation or interview with Mr. Mr. Hubert, uh, by an HR professional. There had been no formal disciplinary action and there had certainly been no escalation to the chief administrative officer, Tim Cawley about Mr. Hubert's conduct. And this is important because all of this evidence, it, it, it begs the question. And Mr. Hubert was entitled to ask a jury why now, why is this termination now appropriate? The defendant's answer is that it was the last straw, but like so much of the evidence in this case, there are dueling explanations for what could have been the last straw here. And the last straw you're talking about is the email. Yes. Yes, sir. The February 6th email. Thank you, Justice. Yeah. I'd like to hear what your position on that is. Thanks. Um, okay. It based on this record, it would, a reasonable jury could just as easily have concluded that Mr. Hubert going outside of his department on January 23rd, 2015 to obtain information that was outside of Mr. Oslin's control was in fact, the last straw that warranted Mr. Hubert's termination. We have a consistent pattern while Mr. Hubert was employed at the board of once he gains access to information, he's either demoted or removed from, or that that information is taken away from him. Beginning in May of 2013, when he was removed from an RFP team after complaining that a, an admitted thief vendor was permitted to bid. And after making noise about, uh, bids that appeared to be non-competitive in what was supposed to be a competitive bidding process, he's removed from the team that's managing that project. February of 2014, after liquid, he loses the autonomy to, uh, enforce the transportation services agreement and levy liquidated damages in line with that contract, which was one of his primary duties. In April of 2014, an audit of 1800 buses designed to give the board some idea of whether the charges that they're paying are in line with the services that are being provided was simply shut down. Summer and fall of 2014, he discovers more than a thousand riders in the system that are being paid for that aren't actually riding these buses, which brings us to the winter of 2014. When he's introduced to the idea of being stuffed into the student transportation services warehouse manager job where he will have no access to information. So now we're up to January 22nd of 2015. His routing function is completely taken away. He no longer has access to review what the buses are doing and when. January 23rd, he goes outside of his department to gain access to surveillance footage that could, when reviewed, determine whether these buses were arriving at schools, whether they were leaving the bus yards, which would help, which would help student transportation services, make sure that they're being billed for charges that they're actually getting. And that Which would, which is an opportunity for Mr. Hubert to continue to develop evidence to support what he believes is fraud within the department that Could very easily based on a reasonable interpretation of these facts be the last straw because now Mr. Oslin has lost his chokehold on the information. That he can use to preserve his private his prospects at private sector employment. So now we're January 23rd outside the department. Now we're at February 6 and Mr. Hubert sends an email to Ms. Lausman Mr. Oslin gets a hold of it and bingo. Now we've got escalation to Mr. Cawley. We've got billed the case for termination with a hasty, hasty investigation and Mr. Hubert is fired six days later. What about the Pardon me. What about the statement by Chicago Public Schools that it is undisputed that Hubert never engaged in protected activity. Is it as clear that he was merely addressing issues that were within the scope of his job. No, absolutely not. Your Honor. Thank you for the opportunity to answer that question. Mr. Hubert was hired to enforce the transportation services agreement between the board and these bus companies. It was not within his job description to work with law enforcement to ensure that there was no fraud happening within the department that he's not he's not with the inspector general's office. That wasn't his job. His job was to enforce a contract and get kids to school safely and on time for as cheap as possible for the taxpayer. That was his job. His job was not to go out and talk to police officers. As, as was the case in some of the law that he defended The Chicago Public Schools are saying it's undisputed. So, so you're saying you dispute it. Absolutely. I mean, they say it's undisputed. There's nothing in the record that shows it that that was Something agreed to or totally Out of the realm of issue. Right. And in all candor when we read that argument, it was we really felt like it was out of left field because there is certainly nothing in his job description. There was nothing in his deposition. There's nothing in any other deposition that he was required to Pursuant to his employment ensure that that Law Enforcement was kept apprised of his suspicions of fraud. So yes, your honor, we would we would suggest that was not undisputed Okay, if you want to reserve time you're pretty much up. Are you is this a good time to break This is a good time, Justice Griffin. With the with the statement that based on the reasonable inferences contained in this record, we would respectfully suggest that this court reverse the trial court's order of summary judgment. Thank you. Thanks counsel. Good afternoon, Your Honors, and may it please the court. At the outset, I would like to make it clear that the board position on protected activity is that it is undisputed that to the extent that Hubert relies on activity outside of his reports to in cooperation with law enforcement. He has not engaged in protected activity throughout the summary judgment process and this appeal. plaintiff has relied solely on one case to discuss the protected activity issue in this case that's Palmatier that case specifically discusses The protect the public policy related to citizens reporting to law enforcement. We do not dispute that him that Hubert reporting to law enforcement cooperating with law enforcement. Would constitute protected activity. There's no dispute over that issue that is when we say it's undisputed It's that it's undisputed that outside of that report to in cooperation with law enforcement. There was no additional protected activity. I want to make that clear at the outset. Further, while plaintiff has brought to claims before At the trial court level. This case is, in our opinions, primarily about causation. The trial court determined that no reasonable juror looking at the record in this case will conclude that Hubert's termination was caused by his reports to in cooperation with law enforcement, which has been Which has been plaintiff's contention throughout this case. It's our position that plaintiff has forfeited any argument. And that raises an issue as to whether or not his internal complaints to management rise to the level of protected activity. Therefore, I'm going to focus my prepared remarks on causation. However, I'm open to answering in your, your honors remarks regarding protected activity and what protected activity is that issue in this case. Would you would you agree that The Chicago Public Schools motive through motive in terminating Mr Hubert is a question of fact. I would agree with that to an extent at the Illinois courts have been clear that if a plaintiff is unable to muster any evidence of causation, then the case is right for summary judgment. That's our contention here plaintiff has not pointed to a single shred of evidence on which a reasonable fact finder could find causation in this case where there's some evidence potentially that's just not what we have here. We don't have Hubert relies on wild emphasis that he himself made, particularly in relation to the February 14 2014 What's so wild about it. I mean, I, I saw it. What's wild about that email. I think what I'm saying is that his inference regarding that email and what and that it was a threat of retaliation is not a is not a it's our contention that that is not a conclusion that a reasonable fact finder would come to On what basis. Can you make that because why would that email of an old case be sent to him. It wasn't about the facts in the case. You know, it's a decades. Okay, so that can't be the reason So what is it That we're talking about here. I mean, you know, you can't differentiate it on who's involved in the case of the facts of the case. The fact is, Can a jury determine whether that was a threat or not. Yes, Your Honor. So it's that email that February 14 email is one of five different emails that were sent on the same day. First, as I stated before, the only protected activity that occurred in this case is Hubert's alleged cooperation within reports to law enforcement that occurred in November of 2013 This email was one of five emails all related to our transportation or jewels transportation that was exchanged between Hubert and Auslan on March 14 of 2014 That's several months after Hubert engaged in any alleged protected activity. Further, Hubert wasn't subsequently terminated until February of 2015 this email was sent 14 months prior to his termination, there's Also, the plain text of the email simply points to the fact that something occurred with arts, which is a Bus transportation company that has some relation to jewels, which is a vendor that both Auslan and Hubert were actively trying to ask So the fact that both of them showed interest in jewels and arts in February of 2014 months prior to July of 2014 when Auslan ultimately worked to get jewels relationship with the board terminated. On these facts, there's nothing that suggests that it's at all related to any sort of protected activity. That's, that's the board's contention. It's not that that if if this email were as striking as plaintiff painted it to be if it literally said I know what you're doing. Stop. That would be something that maybe rose to that level, but it's nothing like that. The plain text of the email showed Auslan's interest in arts and showed us and the context of the email showed Auslan's interest in jewels, a bus company that they were actively trying to oust There's no other evidence. No other testimony. No other anything to suggest that these emails rise to the level to support an inference of retaliatory motive or an actual threat of retaliation. Aren't the inferences supposed to go in favor of the non moving party. Yes, Your Honor, reasonable inferences and it's our and it's our interpretation and agreeing with the trial court that the inferences that Hubert would have the court draw Are not reasonable. When you look at an email sent 14 months prior to his termination. How can one look at that in the context of how the email is sent. There's so many when Part of the issue in this case is that the quote unquote issues of fact and inferences that Hubert points to throughout his briefs throughout his argument had been wildly distorted before they were presented to Your Honor. Specifically with the March 14 email in his brief Hubert states that this was an email about the last whistleblower that worked for CPS First of all, the case was from 1986. So this was definitely not the last person who whistleblow within a department. Second of all, this case dealt with someone at the CTA and not It was never dealing with someone internal to CPS. So this inference. This idea that somehow Osmond is saying this is what happened to the last one. Don't you do it either. It's totally misguided. What would you say the purpose of it was what was the inference that should be As I mentioned, this email was one of five emails. They're all in the record. One of five emails that was all sent on March 14 2014 All dealing with our transportation and jewels transportation as your honors are rare from the record and from both statements of fact. To both Hubert and Osmond his immediate supervisor were dealing with vendor misconduct throughout this time. Osmond was working with the Office of an Inspector General. Let me, I'm sorry, let me back up in August of 2013 Hubert raised concerns to Osmond about vendor misconduct. Osmond immediately. I'm sorry, vendor collusion, more specifically. Osmond immediately raised those concerns to the Office of the Inspector General without any provocation. There's no Indication in the record that he was provoked by anyone to do this. He immediately raised the concerns to the Office of an Inspector General After that, the Office of the Inspector General followed up with Osmond and said, I'm also interested in this. I'm actively involved in an investigation involving these vendors. Would you and Hubert please meet with me to discuss At that point, both Hubert and Osmond continue to work with the Office of the Inspector General to collect information related to jewels and other vendors that the Office of the Inspector General was interested in This investigation continued throughout March of 2014 so these emails are clearly in relation to both Hubert and Osmond's continued concern for the same. Hubert never rebuts this contention, never said I didn't, we weren't exchanging emails in this regard. He simply ignores that fact and pulls out one of the emails that he can paint that he drew a wild inference off Based on and jumps on that email and suggests that it's a retaliatory motive. You keep saying wild email or wild issue. Wild. I don't think you've answered respectfully. I don't hear an answer to Judge Griffin's question. That what you just said doesn't answer his question. Why would he send that email. Now you've talked about the facts. I already went through there with you. I said the facts of that case and when it was and so forth, that isn't, you know, you heard Appellant's argument on it and As a matter of for the jury of an issue of fact here, the jury can draw an inference one way or the other. You seem to, if you could answer that question. Why that email, not one of five. We're not talking about the other four. We're talking about this one. What was the message being sent? That's the question. What message. It's a message being sent. Why did he said So, I'm sorry if you're on and so I wasn't answering the question. I was attempting to explain that it was part of a continued dialogue between Hubert and Oslin. That's the question. The question is, why that email not As you said, it's one of five. Okay. He didn't have to send it, but he did said, why did he send it. Is there testimony said exactly why he sent that email. Yes, I've been testified that Hubert brought the issue of arts transportation up to Oslin. Hubert raised the issue of arts transportation to Oslin and indicated to Oslin that That arts and jewels were involved with each other. When asked about this email. He said that he sent several articles, trying to explain that This that there were other individuals that reported wrongdoings to arts. I'm sorry about arts in the past, trying to show a pattern of Issues within arts and jewels, a pattern of misconduct to emphasize why they he needed that company needed to be ousted. It was never intended as a warning or a threat. It was intended as here's additional evidence that arts and jewels have engaged in this conduct. Would a, would a jury be entitled to disregard that explanation. I think that a jury would be entitled to consider dual explanations or dual never narrative is that actually what existed. There is no evidence in our perspective from from the board's perspective that supports the other quote unquote narrative. But a jury would be able to hear your explanation. And disregard it and accept the plaintiff's explanation or inferences is reasonable or unreasonable. Correct. Yeah, the jury could find that they don't believe Oswin. Right. I think that's right. If there was sufficient evidence in that email or in the context of the email. You he's going to testify. He's going to explain. He's going to say all these things that you're articulating today in a jury has the prerogative or the jury should be the entity that either accepts that explanation, as opposed to the plaintiff's theory or rejected right Your Honor, it's our contention that that is true if there's evidence to rebut that narrative. That's the issue in this case is that there's not this is unrebutted testimony Hubert never came out and said I received any additional threat that plain text, the context of the email the Timing of the email support one theory. There's nothing to support a dueling theory and and that's our concern here. Well, I don't want to beat a dead horse, but in every case, you know, he said she said type of situation. Many times there's no rebuttal to the other side's explanation and it's for the fact finder to decide which one is more credible and acceptable and carries a sufficient weight. You know, with all respect to your argument. It's a good argument, but it's not an argument that should be decided on summary judgment. It's something that the fact finder should be entitled to weigh consider in rule one Respectfully, Your Honor, and again not to beat a dead horse. Our contention is simply that Hubert relies on this email as evidence of One knowledge of as evidence of Auslan's knowledge that Hubert engaged in protected activity first and second as evidence of a retaliatory motive. The plain text of this and it's our contention. I just, I don't mean to argue or go back and forth with your honor. I just want to make sure that our position is clear. Our contention is that there's nothing in the plain text context for timing of this email that supports any inference that Auslan had knowledge. There's nothing in the email that says Hubert paints this email as saying, I know what you're doing. Stop this email. This email was sent several months in March of 2014 months. Understand that we understand, you know, you think it's a wild inference and jury may think it's an acceptable. That's, that's my only point. Okay. And you argued your position terrifically. Thank you, Your Honor. Do you, do you want me to continue Sure. Okay, so going Another. So again, our position is that several of Hubert's Issues of fact are simply misstatements of the record or distortions of the record intended to look like material issues of fact. Another one of these is one that you that Alludes to a meeting with vendors in March of 2013 that led to, quote, Hubert's ouster from the RFP team. One thing that plaintiff ignores again here is that plaintiff specifically called African American owners and Specifically that the board needed to maintain an appearance of impartiality. These are the sorts of distortions that I could go through all of them in this talk. I'm not sure it's helpful for, Your Honor, for me to go through all of them, but these are the types of distortion and the types of misstatements of the record that we believe Distinguish our theory of the case from plaintiff's. If you need to omit If you need to omit material issues of fact, if you need to distort the record, take it out of place, switch things around, then it's then it's relatively clear that the state that the record is not in your favor. And yes, Your Honor. How do you respond to counsel's statement that the procedures, the typical disciplinary procedures weren't followed, you know, I don't know if there were letters written a final warnings. What do they call it in the in that field, the incremental Discipline. How do you respond to that. So first, Your Honor, we would say that there's no evidence in the record that progressive discipline is a policy or a practice of the of the board. There is Some test them there that while there is testimony from people who weren't Oslin about what they would have done in that situation, those individuals never spoke up and said I went outside of my normal procedures. There's not, there is no evidence in the record that suggests that this was the procedure. He was supposed to follow and he did it. There's no policy. He would never points to a policy. He would does not point to any specific Program or procedures that were supposed to be followed in relation to the investigation. However, the record is is full of evidence that Oslin did address Hubert's Repeated issues behavioral issues throughout Hubert's employment. For instance, there are several emails which plaintiff himself points to in his briefs. Where Oslin says I repeatedly talked to you about this, please stop being so divisive. I repeatedly talked to you about this, you being aggressive. With me in in certain situations breaks down the culture of the department. There's unrebutted evidence in the record that shows that Oslin brought in. A third party consultant to try to address the issues that were happening within the department related to Hubert's divisive behavior. The record is just simply replete with evidence. However, the record does not contain evidence to support plaintiff's theory that the STS was just a wild, wild West and everyone was just cursing at everyone and being rude to everyone. The record doesn't show this. The record is clear that the concerns that were raised by Hubert's coworkers and by Hubert's subordinates were addressed as they arose. When Hubert reduced someone to tears, Oslin pulled him to the side and spoke to him about it. Whether or not there was formal discipline. Again, there's nothing pointing to anything that suggests that there needed to be. However, even if it were, the Seventh Circuit has made it clear. Often, Illinois courts look to the Seventh Circuit case in R.G.R. Baropoulos for the definition of pretext. In doing so, they look at the quote that says pretext is more than just It's more than just disbelief in the I'm sorry, give me one second. The Seventh Circuit says pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer. It is a lie, specifically a phony reason for some action. While this case obviously doesn't have presidential value, it's important here because if we look to that theory, there is no lie here. Whether or not they follow their progressive disciplinary policy, whether or not they follow any investigation procedures, which they have not cited to, is not controlling here. The issue is whether or not they honestly believe that they were terminating him for repeated behavioral issues or whether or not that's a lie and they actually terminated him for retaliation. I hope that addresses your honor's question. It does. Thank you. And you're pretty much out of time. If you want to make a closing or summary. Yeah, so in lieu of a summary, I would like to just address one final point. The plaintiff, to avoid the fact that there was a 15 month gap between his protected activity and his ultimate termination, the plaintiff points to a January email claiming that that email was evidence of him going outside of his department to go over Osmond's head and take things out of Osmond's control. The problem with this theory is that the, once again, the record just does not support it. The email that plaintiff relies on was an email sent not by Hubert, but by one of Hubert's subordinates. There's no evidence in the email or otherwise in the record that suggests that this email is in any way related to any of plaintiff's protected activity. Also, there's no evidence in the record that Osmond was even aware that this email was sent. Osmond is not CC'd on the email. There's no testimony between Osmond or Hubert discussing whether or not Osmond viewed the email. There's just simply nothing to support the contention that Osmond was concerned about Hubert going outside of his control. What's also telling in this situation is that the other employees that were involved in the meeting that was related to the email were not terminated. These other two employees remained at CPS long after Hubert because they didn't have similar behavioral issues. And with that, I'm going to issue that would lead to a reasonable fact-finding to make an inference of causation. We suggest that summary judgment in the board's favor was appropriate and asked that the court affirm the trial court's decision. Thank you. Thanks very much. Counsel? Yes. Very briefly, your Honors, first only because my client's character has been stained and counsel's argument, I would like to briefly address the implication that Mr. Hubert was somehow not of a sound character during the 2013 meeting with Jules Bus Company. That assertion ignores Paul Oslin's own testimony that he did not believe Mr. Hubert acted unprofessionally or was a, was a quote, racist at that meeting. And I'd like to just move on from that if I could. And so I'll kind of go, let's start, I suppose, with the email. The defendant would have plaintiff need to meet a burden that the law does not impose. These cases have to be built on circumstantial evidence because the quote email, I know what you're doing. Stop doesn't exist in these contexts. We're permitted as a plaintiff to rely on circumstantial evidence because under these circumstances, it's very difficult to build a case based on direct evidence because an improper motive is very rarely admitted to or written down to be discovered. But that doesn't mean that summary judgment can't be appropriate. I mean, counsel's last argument I thought was extremely well presented. And the question is, you know, we have the email a year before. And a lot of things happened during the following 12, 13 months. So the connection becomes more elusive as time passes. It doesn't improve your case. It hurts your case. What's your response? Thank you for that, your honor. We would suggest that it's not as tenuous as the defendant has made it seem to be. Because in addition to that email, we have a consistent pattern of Mr. Hubert when he discovers information, losing access to that information, having responsibility and then being demoted. This is a pattern of behavior that demonstrates Mr. Oslin wants to remove Mr. Hubert from the conduct that Mr. Hubert is suggesting was exactly what got him terminated, which is investigating to provide information eventually to law enforcement. That can be used to hopefully eliminate fraud within the Chicago public schools. Well, also in line with his behavior, which was a problem from almost the beginning, as I understand the record. With regard to his temper and the way he interacts with the people in the department and so forth. That seemed to be something consistently that runs through this whole thing. And I think that's part of what CPS is saying. I think viewed in a larger context, Justice Hyman, we have to consider the environment that Mr. Hubert was in. Every single witness conceded at their deposition, every single witness that the board put forth said, this is a difficult working environment. The stakes are high, tempers flare, people get angry, and we still have to get things done. We still have to get these kids to school on time. Mr. Hubert's management style, some might consider abrasive, some might consider necessary to make sure that things are done correctly. Especially when we have so much evidence in this record that the folks surrounding him had no experience in yellow bus services, contracting with vendors or busing at all. Mr. Hubert was one of the only people that had experience with busing in that entire department. And so, yes, his management style often was firm. But it was the evidence bears out that it was warranted. He said... I don't, I have to, to say that it was warranted, I think really, how can you say that that was warranted? You just said that if people are not knowledgeable or are new to their jobs, then how is it justifiable to conduct oneself like that? You're supposed to be there to help them get the job done, not to create a hostile environment, which is not the issue in this case. But again, it sort of is the way he conducted himself. It seems to me what you just said indicates that, yeah, this guy, he wasn't helping us get things done. He was causing a lot of strife in his department. Thank you, Justice Hyman. I'm not sure that's what I meant to say. I'm certainly willing to agree with your contention that perhaps it was difficult. Mr. Hubert was dealt a hand. He wanted to help. He was hired to create efficiencies. His work was praised throughout this record. He did help save taxpayers money. He did create efficiencies within the department. And his management tools involved more sticks than carrots. And he did the best he could with the tools that he was given. As long as they don't give those carrots to the dead horse, I think we're okay. Thank you, sir. And I'd just like to address one more point because I do believe I'm running out of time. The email has been, to put the justice's words to use, beaten to the dead horse. The only other response to the formal disciplinary procedures that the board was not required to put into place, it does beg the question why they had to happen here. If this termination was proper and lawful and everybody in the board believed it was proper and lawful, then why conduct an investigation at all? Why paper this file with a shabby investigation that doesn't include a statement from the person who was ultimately going to be terminated, that the investigator's notes weren't saved? Why was that included at all? All of these inferences come together to show that there is a question of fact on whether the board's motive for terminating Mr. Hubert was lawful. And for those reasons, we would respectfully ask that this court reverse the trial court's order of summary judgment. Well, thank you very much. We really appreciate your work. You both, all three of you, I'm sure have done a great job and we'll take this under advisement and you'll be hearing from us shortly. Thanks again.